PLEASANT ET AL. *v.* DUDLEY AND SUN OIL COMPANY

[No. 18,395. Filed June 3, 1953.]

*James W. Brown,* of New Castle, for appellants.

*William B. Weisell* and *Slaymaker, Locke & Reynolds,* of Indianapolis, for appellee.

ROYSE, J.—Appellants are, respectively, the widow and minor son of one Charles D. Pleasant, who died as the result of accidental injuries arising out of and in the course of his employment by appellee, Dudley, who operated a filling station in New Castle, Indiana. Appellants filed their petition for compensation against both appellees. The Full Industrial Board of Indiana found in favor of appellants against appellee, Dudley, and in

favor of appellee, Sun Oil Company. The Board awarded appellants $16.50 per week for 300 weeks and the statutory burial allowance of $300.00.

Upon proper assignment of error appellants here contend the Board erred in its finding in favor of Sun Oil Company.

The facts as disclosed by the record may be summarized as follows: Some time prior to the accident which gives rise to this litigation, appellee, Dudley, bought from one Maurer, a filling station in New Castle, Indiana. He bought it on the basis of inventory in stock at the station. He leased the premises from a Mr. Jennings. Subsequently, he entered into what is known as a "Dealer's Contract" with appellee, Sun Oil Company. The provisions of this contract, as summarized in appellants' brief, are as follows:

> "SECTION 1. It was therefore agreed by the parties that at the request of Dealer, the Company loaned Dealer for use in connection with the storage, advertising, sale and delivery of Sunoco products, certain equipment which was erected or installed upon the premises as follows: 2 computer pumps, 4 - 60 gallon Hiboys (oil containers), 3 - 2500 gallon underground tanks and 1 Diamond Arrow Sign with reflectors and pole.

> "SECTION 2. Dealer agreed to buy from Company and Company agreed to sell to Dealer, Sunoco Dynafuel for resale on said premises, provided that Dealer should not buy less than certain minimum quantities and Company should not be required to sell more than certain maximum quantities as set out in the contract.

> "SECTION 3. Company agreed to sell said gasoline to Dealer at prices established at its plant.

> "SECTION 4. A similar provision was provided for as to motor oils and lubricants.

> "SECTION 5. The terms of payment were cash unless otherwise established by the Company's credit department and further:

'The condition of Dealer's account and the financial responsibility of Dealer must at all times be satisfactory to Company, otherwise, shipments may be suspended or terms revised, without releasing Dealer from his obligations under this agreement.'

"SECTION 6. The Company reserved the right at any time to change the prices at which they would deliver the products to Dealer, and it was agreed that the products which Dealer would buy would be delivered by the Company at the above premises only and in certain minimum quantities.

"SECTION 7. The agreement was to be in force for one year from November 30, 1949, and thereafter for additional periods of one year at a time, provided that either Dealer or Company could cancel the agreement at the end of any year upon 60 days notice.

"SECTION 8. This section provides that the agreement constitutes the entire contract and may not be assigned by Dealer.

"SECTION 9. This calls for Dealer to pay all license and permit fees, taxes, and charges under any ordinances or laws incident to the equipment or signs used on the premises and the sale of the products and the operation of the business.

"SECTION 10. This provides that the Dealer shall operate under Dealer's name displaying on the premises the Dealer's name as proprietor so that in the operation of the business, Dealer would not represent said business as an agency of the Company or Dealer as an agent for the Company.

"SECTION 11. All the equipment and signs loaned by the Company should at all times remain the property of the Company; that such equipment could be used only for the purpose of storing, advertising and selling Sunoco products and for no other purpose. Any equipment belonging to Dealer, not loaned by the Company, was required to be kept painted in the Company's colors.

"SECTION 12. Dealer agreed to indemnify the Company from losses, damages and claims arising out of injury to any person or property (including

the person or property of Dealer or Dealer's employees) caused in any way from the operation or use of the aforesaid equipment used in handling Sunoco products.

"SECTION 13. This required all branded Sunoco products delivered by Company to the premises to be sold as such and not be mixed or blended with any other substance. Company reserved the right to enter upon the premises and inspect the equipment and test and sample the products of Company offered for sale and make repairs to the equipment, though not required to do so.

"SECTION 14. If Dealer should sell or abandon his business on said premises or assign the agreement without Company's consent or be evicted or should mix, blend or adulterate any of the Company's branded products, or suffer attachment, execution or like process to be issued against Dealer, Company was given the right to terminate the agreement on 24 hour written notice and if such termination occurred during the first year of the contract, the Dealer was to be charged for the Company's expense in installing the equipment. Said Section further provides that if Dealer should fail to purchase the minimum quantities specified during any two calendar months in a 12 month period, then Company could terminate the agreement; and on the other hand, if the Company should fail to deliver Dealer's orders within the limit specified for two months out of twelve, then Dealer could terminate the contract. That upon any termination, Dealer agreed that Company could lawfully enter upon the premises for repossession of its equipment without any liability for damages. Also Dealer consents to any action or confession of judgment necessary for repossession.

"SECTION 15. Any temporary waiver or failure to enforce provisions of the contract would not operate to affect the rights of the parties to enforce all provisions thereof.

"SECTION 16. This provides for separability of the provisions of the contract.

"SECTION 17. This protects the Company for any delay in delivery due to casualty, strike, etc., or

by any governmental order and granted similar protection to the Dealer if unable to operate because of reasons beyond his control. The contract contained a consent by the owner of the property from any claim of owner in event of default of Dealer."

It is undisputed that Dudley hired decedent and Sun Oil Company had no contact with decedent or right of control over him. Dudley did not carry Workmen's Compensation Insurance. Dudley owned all of the merchandise in the filling station, having purchased it from Sun and other suppliers. He was not required and did not purchase all of his supplies from Sun.

Appellants contend, first, the Dealer's agreement between appellees establishes as a matter of law that decedent was an employee or agent of Sun. Second, that if Dudley was not an employee, then this is a contract for the performance of work under §14 of the Workmen's Compensation Act; that under this section Sun would be liable to the same extent as the contractor with whom they contracted where they failed to exact a certificate of compliance from Dudley showing that he carried insurance or had qualified as a self insuror.

In our opinion, the Dealer's contract set out in substance herein is substantially the same as the contract before the Supreme Court in the case of *Mid-Continent Petroleum Corporation* v. *Vicars et al.* (1943), 221 Ind. 387, 47 N. E. 2d 972. In that case the Supreme Court reversed our judgment affirming an award of the Industrial Board under facts quite analogous to those in this case. We are of the opinion the ruling in that case is controlling here.

Judgment affirmed.

NOTE.—Reported in 112 N. E. 2d 586.